1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT
6          FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8   VERNON J. BRAGG,                      )   No. C 05-5129 JSW (PR)
                                          )
9               Petitioner,               )
                                          )   **ORDER DENYING PETITION FOR A**
10      vs.                               )   **WRIT OF HABEAS CORPUS**
                                          )
11  A.P. KANE, Warden,                    )
                                          )
12              Respondent.               )
                                          )
13  _____      )
14
15                          **INTRODUCTION**

16          Petitioner, a prisoner of the State of California, has filed a habeas corpus petition

17  pursuant to 28 U.S.C. § 2254 challenging the Board of Prison Terms ("BPT") denial of

18  parole during parole suitability proceedings in 2004.  This Court ordered Respondent to

19  show cause why a writ should not issue.  Respondent filed an answer, memorandum and

20  exhibits in support thereof.  Petitioner has filed a traverse.  For the reasons stated below,

21  the petition is denied on the merits.

22                          **BACKGROUND**

23          In 1985, in Sonoma County Superior Court, Petitioner was convicted of second

24  degree murder.  The trial court sentenced him to a term of 17 years-to-life in state prison.

25  Petitioner's minimum parole eligibility date on the life crime was July 17, 1994.  In this

26  habeas action, Petitioner does not challenge his conviction or sentence, but instead alleges

27  that his due process rights were violated by the denial of parole by the BPT during a

28  parole suitability hearing in June 2005.

The BPT relied, in part, upon the following account of Petitioner's commitment offense  from the Board report:

> On March 19, 1984 an inmate from Humboldt County jail reported to the sheriff's department that he knew the location of two dead bodies in Sonoma County.  On March 21, 1981[sic], Dr. Davies made a positive match with the head and dental records for Raymond Rasmussen.  Further investigation and interviews with inmates revealed that Robert Boderly and Vernon Bragg were involved in the murder and disposing of the victim's body.  The victim was a federal witness.  Additional witnesses Christine Tuttle, and Wesley Tuttle and John Werner, reported that they lived near the victim.  John Werner stated that towards the end of June, early part of July of 1992[sic] he saw the victim walk down the driveway–the driveway of his residence with the defendant and Mr. Boderly.  He reported that at approximately 20 to 30 minutes later he heard a sound similar to a firecracker or cherry bomb.  Shortly thereafter Mr. Boderly approached – Mr. Werner saw Mr. Boderly and Mr. Bragg drive away.  Mr. Tuttle became very suspicious that he did not see the victim leave the residence. He proceeded to – He proceeded to enter the garage and saw a pool of blood on the floor.  He stated that he became frightened.  With John Werner's assistance – washed the blood out of the garage.  Mr. Werner stated that he heard yelling and heard them order Raymond on the floor, then heard an explosion.  He turned around and saw the victim laying on the floor in a pool of blood.  He saw the prisoner holding a gun.  On April 1, 1985 the prisoner was convicted of the murder of Raymond Rasmussen.

Petitioner opted not to discuss the circumstances of the crime at the hearing.  However, te Board also considered the prisoner's version from the report which is as follows:

> The prisoner admits responsibility for the commitment offense and he expresses remorse for it.  He said that the probation report is accurate. However, the incident happened unexpectedly after an argument and struggle with the victim.  He stated that he did not help his crime partner dispose of the body.

(Respondent's Exhibit E (hereinafter "Ex. E ") at 14-15.)

At the hearing, Petitioner also testified about his criminal history, which involved a juvenile arrest  at age 15 for theft of a motorcycle, after which Petitioner was placed in an uncle's custody.  (*Id.* at 15.)  As an adult, Petitioner was also convicted of carrying a weapon, for which he was sentenced to a fine and a three month county jail sentence (*Id.*) Petitioner also served a prior prison term of eight years in Texas for aggravated assault and robbery.  (*Id.* at 16.)  The BPT discussed Petitioner's prior drug use, which he testified that he was introduced to in the military and which resulted in a general

honorable discharge from the Marine Corps  (*Id.* at 17-19.)  According to Petitioner's counselor, the drugs he used were Benzedrine, marijuana, LSD, Seconal and methamphetamine by injection.  (*Id.* at 21.)  The BPT considered Petitioner's programming, which included a vocational printing certificate in 1992 and a vocational graphic certificate in 1993, as well as a certificate of completion of vocational upholstery and participation in the dental technician program in 1997 and 1998. (*Id.*)  Petitioner testified that he has not participated in any vocational programming since 1998.  (*Id.* at 21-22.)  Petitioner also attended adult school, received a graphic arts certificate in 1986, attended Hartnell College where he was on the honor roll in 1986 and received a B.A. from San Jose State University, where he was declared a dean's scholar in 1991 for high grade achievement.  (*Id.* at 22.)

The BPT also considered Petitioner's participation in self-help, including participation in the "We Care" program from 1990-95, where he gave numerous speaking presentations to juvenile youth groups, with the emphasis on deterring youth from criminal involvement.  (*Id.* at 22-23.)  He also participated in AA and NA from approximately 1992 to 1997 and he completed the life skills program in 1998.  (*Id.* at 23-24.)

His disciplinary history includes "128" counseling chronos for failing to submit a urine sample and being absent from class in 1986, changing the appearance of an ID card in 1991 and being absent from class in 1995 and 1998.  (*Id.* at 24.)  There was evidence at the hearing that he had four serious disciplinary "115s" in 1998 for failing to comply with grooming standards by cutting his hair and one in 2000 for a mutual combat without serious injury.  (*Id.*)

His most recent psychological report from Dr. Bruce Bakeman, dated 1999 notes a dual diagnosis of methamphetamine in institutional remission and antisocial personality disorder.  (*Id.*)  The psych report notes Petitioner's remorse and good record while in

3

prison and that it is expected he will maintain that same degree of control in the community.  It also notes his participation in the Indian community in prison and that he "has grown spiritually as a result." (*Id.* at 24-25.)  The Bakeman psych report apparently references a chrono from George Martin, the Native American Spiritual Advisor, who stated that Petitioner has been an active and contributing member who's been "an asset to the Native American program in a number of areas. . .and is a good influence on the younger members of the circle." (*Id.* at 25.)   Martin stated that Petitioner "promotes placing the well-being of the group before personal desires.  He is also to be commended for his strong belief relative to wearing his hair in a traditional style." (*Id.* at 25-26.) Dr. Bakeman noted improvements in Petitioner's life and stated that it is expected that the Petitioner will maintain the good record of control exhibited in the controlled setting of prison if released.  (*Id.* at 26.)  According to prison counselor L. Ross, who based his determination on the commitment offense, prior record and prison adjustment, Petitioner would "probably pose a moderate degree of threat to the public at this time if released from prison.  (*Id.* at 27.)

Petitioner told the panel that he had four sets of parole plans.  (*Id.*)  The first involved going to Box Springs, Texas, to help his mother.  (*Id.*)  Petitioner informed the panel that he had alternative plans in Sonoma County or in Monterey County, which included a place to live and work.  (*Id.* at 28-29.) Petitioner also has a job offer in Los Angeles County.  (*Id.* at 32.)

Petitioner was questioned about his 2000 serious disciplinary rules violation for mutual combat, and the Presiding Commissioner noted "[t]his was only a couple of months after you. . .had been to your hearing and admonished to remain disciplinary-free.  Why would you go out and get into a fight?" (*Id.* at 34.)  Petitioner responded that the fight couldn't be avoided and stated "I didn't start it, but I couldn't stand there and let the man put his hands on me so I did what I had to do to get him back off of me and it

was over." (*Id.*)  When questioned about what steps he has taken to address his drug use, Petitioner maintained that although he was unable to participate in AA and NA due to his unwillingness to conform to prison grooming standards, that the Native American Grooming Circle has a portion of its program, "I just went over to that and pretty much relied on that for my primary source of my 12-steps.  It's a little different, but it's basically the same, it's basically go to your higher power." (*Id.* at 36.)

Petitioner was asked by the panel about his placement on "C status" about which the Presiding Commissioner stated, "you're refusing to follow the rules and regulations of the institution.  So why would you put yourself in that position?" (*Id.* at 36.) Petitioner told the panel that he was not on that status for refusal to program, but for refusing to cut his hair which is part of his religious beliefs that "for me my spiritual law is the core of everything that I'm concerned with." (*Id.* at 38.)

The District Attorney of Sonoma County opposed Petitioner's parole based on his serious criminal history, his extensive drug use and on his active participation in the brutal homicide. (*Id.* at 41.)  After his closing comments, Petitioner stated that he wanted to be excused and he left the room before the conclusion of the hearing. (*Id.* at 45-46.)  After Petitioner's departure, the parents of the victim both testified about the effects of the murder on their lives. (*Id.* at 47-54.)

After a recess to consider the evidence before it, the BPT found that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety. (*Id.* at 55.)  The presiding Commissioner explained that, in deciding to deny parole, the panel considered all of the information received from the public in denying parole.  The Board found that Petitioner's commitment offense was carried out in an especially cruel and callous manner, in that the offense was carried out in a dispassionate and calculated manner. (*Id.* at 55.)  The BPT also found that the offense was carried out in a manner that "demonstrates an exceptionally callous

5

disregard for another human being and the motive for the crime was inexplicable." (*Id.*) That conclusion was drawn from the statement of facts that the prisoner and his crime partner went to where the victim was and he was shot in the back and his body disposed of where it wasn't found for several years. (*Id.*) Further, the Board found that Petitioner's escalating pattern of criminality, as well as his prior failed attempts to correct that criminality, were a factor in denying parole. (*Id.* at 56.) They stated that his unstable social history and extensive history of drug use were also a factor. (*Id.*) The Board specified that Petitioner's limited participation in programming was a factor supporting the denial. (*Id.*) The Board also relied on the fact that Petitioner had received a disciplinary for fighting, mutual combat, on April 29, 2000. (*Id.* at 57.)

The BPT also considered the psychological evaluation of Petitioner which was "fairly decent" but noted that Petitioner needed a more recent psychological report, as it was conducted in 1999 (*Id.* at 57-58.) The Board commended Petitioner on his parole plans but found that Petitioner "needs to get off C status, he needs to reinsert himself in the mainstream programming of the institution so that more programs will become available to him." (*Id.* at 58.) The panel noted that he needed to be able to participate in programming that will "enable him to be able to face, discuss, understand and cope with stressful situations in a nondestructive manner, especially in the free community." (*Id.* at 59.) The panel found that "[u]ntil further progress is made, the prisoner continues to be unpredictable and a threat to others." (*Id.*) The panel further noted that Petitioner needed to "realize that there are rules in a structured environment, and if he can't follow the rules [there], he's going to be hard-pressed to follow the rules. . .in the free community." (*Id.* at 59.) The panel commended Petitioner for his participation in the spiritual program. However, the Board denied parole for a period of four years. (*Id.*) The Board relied on the same reasons for the denial, but also noted that until Petitioner decides to participate in the necessary programming "that a prisoner ha[s] to do inside

the institution to show suitability.  And until he decides to do that, he can't demonstrate parole suitability."  (*Id.* at 61.)

Petitioner challenged the BPT's decision in the Sonoma County Superior Court, which issued a reasoned opinion denying Petitioner's claims.  The court found that there was "some evidence" to support the BPT's determination that Petitioner was unsuitable for parole.  (Respondent's Exhibit F at 4.)  The court found that the record supports the finding of the BPT that the commitment offense was carried out in an especially cruel and callous manner.  (*Id.* at 3).  The Sonoma County Superior Court also found support for the BPT's determinations that Petitioner had an unstable social history, Petitioner had programmed in a limited manner and had a negative disciplinary record since his prior hearing and noted that Petitioner chose not to fully participate in his 2004 hearing.  (*Id.*)   The California Court of Appeal and the California Supreme Court summarily denied Petitioner's habeas petitions.  Thereafter, Petitioner filed the instant federal petition for a writ of habeas corpus.  The petition was reassigned to this Court on April 7, 2008.

## DISCUSSION

A.   <u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified under 28 U.S.C. § 2254, provides "the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petitioner is not challenging his underlying state court conviction."  *White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004).  Under AEDPA, this court may entertain a petition for habeas relief on behalf of a California state inmate "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The writ may not be granted unless the state court's adjudication of any claim on

the merits: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at § 2254(d).  Under this deferential standard, federal habeas relief will not be granted "simply because [this] court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).

While circuit law may provide persuasive authority in determining whether the state court made an unreasonable application of Supreme Court precedent, the only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision.  *Id.* at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

B.   Legal Claims and Analysis

Petitioner claims that the BPT's denial of parole in 2004 violated his right to due process because the decision was not supported by some evidence of current dangerousness, the BPT mischaracterized Petitioner's crime as a First Degree Murder and Petitioner's plea agreement with the Sonoma County District Attorney's office was violated.

1.   The BPT Decision

California's parole scheme provides that the BPT "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."  Cal. Penal Code § 3041(b).  In

making this determination, the BPT considers various factors, including the prisoner's social history, the commitment offense and prior criminal history, and his behavior before, during and after the crime. *See* Cal. Code Regs. tit. 15, § 2402(b) – (d).

The record shows, and there is no dispute, that the BPT panel afforded Petitioner and his counsel an opportunity to speak and present their case at the hearing, gave them time to review Petitioner's central file, allowed them to present relevant documents and provided a reasoned decision denying parole. The panel concluded that Petitioner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The panel explained that it found the commitment offense was committed in a cruel manner and found the motive for the crime to be very trivial in comparison with the gravity of the offense. The panel further found that Petitioner had an unstable social history, and significant history of criminality and drug use.

The panel further found that Petitioner had not sufficiently participated in self-help programming based on Petitioner's placement on C status, which Petitioner argued was for his refusal to cut his hair and that Petitioner had a disciplinary finding since his last hearing. The Contra Costa County District Attorney also opposed parole. The Board did commend Petitioner's continued participation in working on improving himself and toward parole.

2.     The State Court Decisions

The state superior court found that the BPT's denial of parole was supported by "some evidence" in the record. (Exhibit F at 4.) Specifically, the court cited the Board's findings with respect to the cruel and callous circumstances of the murder, Petitioner's history of unstable relationships, his prior record of violence, and his insufficient participation in self-help programs, which it found to be supported by some evidence in the record. (*Id.*) The superior court further found that the "BPT's determination of a

9

negative disciplinary record was supported by evidence that he was disciplined for fighting after his last parole hearing." (*Id.* at 3.)  The California Court of Appeal and the California Supreme Court summarily denied Petitioner's habeas petitions.

> 3.      The Federal Right to Due Process

California's parole scheme "gives rise to a cognizable liberty interest in release on parole" which cannot be denied without adequate procedural due process protections. *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *McQuillion v. Duncan*, 306 F.3d 895, 902 (9th Cir. 2002).  The determination does not depend on whether a parole release date has ever been set for the inmate because "[t]he liberty interest is created, not upon the grant of a parole date, but upon the incarceration of the inmate." *Biggs v. Terhune*, 334 F.3d 910, 914-15 (9th Cir. 2003).

Due process requires that "some evidence" support the parole board's decision finding him unsuitable for parole.  *Sass*, 461 F.3d at 1125 (holding that the "some evidence" standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445, 454-55 (1985), applies to parole decisions in § 2254 habeas petition); *Biggs*, 334 F.3d at 915 (same); *McQuillion*, 306 F.2d at 904 (same).  The "some evidence" standard is minimally stringent and ensures that "the record is not so devoid of evidence that the findings of [the BPT] were without support or otherwise arbitrary." *Hill*, 472 U.S. at 457.  Determining whether this requirement is satisfied "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Id.* at 455-56 (quoted in *Sass*, 461 F.3d at 1128).  Due process also requires that the evidence underlying the parole board's decision have some indicia of reliability. *Biggs*, 334 F.3d at 915; *McQuillion*, 306 F.3d at 904.  In sum, if the parole board's determination of parole unsuitability is to satisfy due process, there must be some evidence, with some indicia of reliability, to support the decision. *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005).

When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state. *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007). Accordingly, in California, the court must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" constituted an unreasonable application of the "some evidence" principle articulated in *Hill. Id.; see id.* at 852-53 (finding state court did not unreasonably apply "some evidence" standard to uphold parole suitability denial where there was some evidence at the time of the hearing to support a finding that the prisoner would present a danger to society based on the nature of the commitment offense under the applicable parole regulations).

There was evidence before the BPT indicated that Petitioner continued to pose an unreasonable risk of danger to society. To begin with, Petitioner's participation in this cold-blooded killing was preceded by a significant criminal history and prior prison sentence. The killing was especially cruel in that the victim was shot in the back at close range and his body was disposed of and not recovered for two years. Moreover, there was support in the record for the findings that Petitioner had an unstable social history and a substantial history of drug use. The Board considered Petitioner's prior convictions, including a prior robbery and prison term in Texas.

Here, the Board noted that Petitioner's failure to participate in programming supported a finding that he remained a danger to the public, for failing to comply with the institution's rules. However, this Court does not find that Petitioner's placement on "C status" for failing to cut his hair based on his religious beliefs constitutes "some evidence" of his continued risk of danger to the public. *See, Warsoldier v. Woodford,* 418

11

F.3d 989, 996 (9th Cir. 2005) (holding that because the grooming policy puts substantial pressure on inmates to abandon their religious beliefs by cutting their hair, it constitutes a substantial burden on the practice of their religion under the Religious Land Use and Institutionalized Persons Act of 2000.)

However, this Court does find that the BPT's reliance on Petitioner's 2000 serious disciplinary finding for "mutual combat" constitutes "some evidence" to support the BPT's decision.  While Petitioner did testify at his hearing that he was defending himself during the fight, his disciplinary record included a serious disciplinary finding from shortly after his prior parole hearing for "mutual combat."  Petitioner's story of self defense was apparently not credited in the prison disciplinary process.  Petitioner has submitted some documents to the Court regarding his "exoneration" for a mutual combat.  *See* Exhibit E, Second Amended Petition.  However, given that these documents are dated 2006, two years after his BPT hearing and after the state courts rendered their decisions on his case, it does not appear that they relate to the "mutual combat" considered by the BPT here.  Such evidence amounts to "some evidence" in support of the BPT's determination that Petitioner continued to present a risk of danger if released to the public, and consequently that Petitioner was not suitable for parole.

The Ninth Circuit has noted that "over time" the BPT's "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment" would "raise serious questions involving his liberty interest in parole." *Biggs*, 334 F.3d at 916.  However, in this case the BPT's denial of parole was not only based upon Petitioner's commitment offense and prior criminal history.  Here, there were other supported reasons, described above, for their denial of parole as well.

Based upon the record in this case, the state courts' determination that there was some reliable evidence to support the BPT's decision, and that Petitioner's right to due process was not violated, was not contrary to or an unreasonable application of federal

12

law.  *See, e.g., Rosas*, 428 F.3d at 1232-33 (upholding denial of parole based on gravity of offense and psychiatric reports); *Biggs*, 334 F.3d at 916 (upholding denial of parole based solely on gravity of offense and conduct prior to imprisonment); *Morales*, 16 F.3d at 1005 (upholding denial of parole based on criminal history, cruel nature of offense, and need for further psychiatric treatment).  Accordingly, habeas relief is not warranted on this claim.

4.    Breach of Plea Agreement Claim

Petitioner asserts that his plea agreement was breached when the BPT denied parole because the representative of the Sonoma County District Attorney's office opposed parole at his hearings in 2000 and 2004, despite the promise of the Assistant District Attorney at his criminal plea and sentencing that the office would not oppose parole if rehabilitation was shown.  (Second Amended Petition at 6.)  He alleges that the district attorney's opposition to his parole violated the plea agreement.

The breach of plea agreement claim is time-barred.  "A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."  28 U.S.C.§ 2244(d)(1).  A habeas petition by a state prisoner challenging a decision of an administrative body, such as the BPT, is covered by the statute and the limitations period starts to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1)( D); *Shelby v. Bartlett*, 391 F.3d 1061, 1066 (9th Cir. 2003); *see also Redd v. McGrath*, 343 F.3d 1077, 1081-82 (9th Cir. 2003).

Here, the factual predicate or basis of Petitioner's claim that his plea agreement was violated was known to him no later than at the time of his 2000 hearing.  He was denied parole at his parole consideration hearing in 2000 after the District Attorney's opposition, meaning the actual breach occurred no later than that date.  Yet, Petitioner did not file his federal habeas petition challenging the breach of the agreement within the 1-year

13

limitations period, even allowing for the time during 2004 and 2005 that his state habeas petitions were pending.  He cannot revive the time-barred claim by asserting that the agreement, which by his account was irrevocably breached in 2000, was breached again in 2004.

However, even if the claim was not barred by the statute of limitations, the breach of plea bargain claim has no merit.  "Plea agreements are contractual in nature and are measured by contract law standards."  *Brown v. Poole*, 337 F.3d 1155, 1159 (9th Cir. 2003) (*quoting United States v. De la Fuente*, 8 F.3d 1333, 1337 (9th Cir. 1993)).  Although a criminal defendant has a due process right to enforce the terms of a plea agreement, *see Santobello v. New York*, 404 U.S. 257, 261-62 (1971), there is no evidence that Petitioner's subjective expectations about how parole would be decided were part of the plea agreement.  He has not pointed to any language in any plea agreement that shows that any specific term in his plea agreement has been breached.  Petitioner's sentence upon his conviction based on his plea agreement was to an indeterminate term of 17-to-life in state prison.  He has apparently received the parole consideration at hearings to which he was entitled under that agreement and sentence. The Sonoma County Superior Court's rejection of Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law as determined by the U.S. Supreme Court. Petitioner's claim that his plea agreement was breached in violation of his right to due process fails.

5.    Recharacterization of Crime as First Degree Murder Claim

Petitioner also claims that the Board's denial of parole was based on its recharacterizing his life crime as a first-degree murder, instead of the second-degree murder to which he pled.  Petitioner argues that in recharacterizing his offense this way, the BPT has illegally subjected him to serving a sentence beyond that expected for second degree murder.  However, the plea bargain called for a sentence of 17 years-to-life on the

14

second degree murder conviction.  Although Petitioner contends he is being punished as if he had pled to first degree murder, he in fact is receiving the parole consideration to which his 17-to-life sentence entitles him.  First degree murder is punishable by death, life without parole, or a term of twenty-five years to life.  Cal. Penal Code § 190(a).  In support of this argument in his petition, he references the "matrix" used to set parole terms for prisoners who have been found suitable for parole.  Under state law, the matrices come into play only after a prisoner has been found suitable for parole, *see In re Dannenberg*, 34 Cal. 4th 1069, 1071 (Cal. 2005).  However, here, Petitioner was found unsuitable for parole, so he did not have a due process right created by state law to have the Board apply the matrix, and of course there is no such direct federal right.  This claim is without merit.

## CONCLUSION

For the reasons set forth above, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED:  March 9, 2009

JEFFREY S. WHITE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

BRAGG,

           Plaintiff,

  v.

KANE ET AL et al,

          Defendant.
_____/

Case Number: CV05-05129 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 9, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Vernon James Bragg
 D-04720
P.O. Box 8502
Coalinga, CA 93210-8502

Dated: March 9, 2009

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk